J-S30014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SAMUEL N. CABRERA | |
| Appellant | No. 511 EDA 2015 |

Appeal from the Judgment of Sentence January 16, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009793-2013

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED JUNE 15, 2016**

Appellant, Samuel N. Cabrera, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his convictions of third degree murder, involuntary manslaughter, and endangering the welfare of children ("EWOC").[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.[2]  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

---

[1] 18 Pa.C.S.A. §§ 2502(c), 2504(a), and 4304(a)(1), respectively.

[2] Appellant filed his supplemental concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on June 4, 2015, not June 4, 2014, as stated in the trial court opinion.

WAS NOT THE EVIDENCE INSUFFICIENT TO SUPPORT THE VERDICT OF THIRD DEGREE MURDER AS A MATTER OF LAW WHERE APPELLANT DID NOT ACT WITH MALICE WHEN HE STRUCK HIS CHILD?

DID NOT THE TRIAL COURT ERR AS A MATTER OF LAW AND ABUSE ITS DISCRETION IN ALLOWING HEARSAY TESTIMONY IN THE FORM OF A VIDEO RECORDING OF A CHILD WITNESS PURSUANT TO THE TENDER YEARS HEARSAY ACT, 42 [PA.C.S.A]. § 5985.1, WHERE THE HEARSAY DID NOT CONTAIN CORE INDICIA OF RELIABILITY—SPONTANEITY AND CONTEMPORANEITY[?]

(Appellant's Brief at 3).

A challenge to the sufficiency of the evidence implicates the following legal principles:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa.Super. 2005)

(quoting **Commonwealth v. Bullick**, 830 A.2d 998, 1000 (Pa.Super. 2003)).

The Crimes Code defines murder as follows:

**§ 2502. Murder**

**(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

**(b) Murder of the second degree.**—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

**(c) Murder of the third degree.**—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

\* \* \*

18 Pa.C.S.A. § 2502(a)-(c). "Murder in the third degree is an unlawful killing with malice but without the specific intent to kill." **Commonwealth v. Dunphy**, 20 A.3d 1215, 1219 (Pa.Super. 2011). Malice is defined as:

[A] wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured…. [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

**Commonwealth v. DiStefano**, 782 A.2d 574, 582 (Pa.Super. 2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). "Malice may be inferred by considering the totality of the circumstances." **Dunphy, supra**.

After a thorough review of the record, the briefs of the parties, the

- 3 -

applicable law, and the well-reasoned opinion of the Honorable Sandy L.V. Byrd, we conclude Appellant's issues on appeal merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed September 30, 2015, at 11-16, 24-28) (finding: **(1)** Commonwealth's expert witness, Dr. Aaron Rosen, described victim's injuries to include multiple rib fractures, fractured collarbone, and significant lacerations to victim's liver; Dr. Rosen opined to reasonable degree of medical certainty that these injuries caused victim's death and were caused by severe blunt force trauma; Dr. Rosen also noted that victim's autopsy revealed new bone formation on victim's rib and collarbone, which indicated victim had sustained prior injuries; Dr. Rosen further stated that elasticity of child's bones makes them very difficult to fracture and that victim's injuries required significant amount of force; Commonwealth also demonstrated Appellant's guilt through introduction of Appellant's three different statements of what happened to victim; Appellant's different versions of incident indicated Appellant's attempt to hide fact that he was alone with victim when victim sustained fatal injuries; all of Commonwealth's evidence established Appellant grossly disregarded that his actions might create substantial and unjustifiable risk of death or serious bodily injury to victim; further, Appellant failed to obtain immediate medical care for victim in violation of his parental caretaking duties; thus, Commonwealth proved beyond reasonable doubt that Appellant acted with

malice when he beat victim to death, and trial court properly convicted Appellant of all offenses charged; **(2)** video of child witness' statement, taken six months after victim's death, was relevant to Appellant's case; additionally, time, content and circumstances of statement provided sufficient indicia of reliability; video revealed that only person present during interview with child witness was interviewer from Philadelphia Children's Alliance; in fact, child advocate, detective, and social worker merely observed interview from another room and were not involved in questioning of child; additionally, statement given by child witness was spontaneous and mirrored child witness' in-court testimony; further, child witness demonstrated competent mental state, used terminology of child of similar age, and lacked motive to fabricate; thus, Commonwealth established truthfulness and reliability of statement, and trial court properly admitted statement pursuant to Tender Years Hearsay Act). We accept the court's sound reasoning.

To the extent the separate sentence for Appellant's EWOC conviction implicates the legality of the sentence, which we raise *sua sponte*,[3] the court indicated on the record that this conviction stemmed from Appellant's failure to seek medical attention for victim. In contrast, Appellant's third degree

---

[3] ***See Commonwealth v. Randal***, 837 A.2d 1211 (Pa.Super. 2003) (*en banc*) (stating appellate court can raise and review legality of sentence *sua sponte*).

murder and involuntary manslaughter convictions stemmed from Appellant's beating of the victim. Because Appellant's involuntary manslaughter and EWOC convictions pertained to separate criminal acts committed by Appellant, they do not merge for sentencing purposes. ***See Commonwealth v. Robinson***, 931 A.2d 15 (Pa.Super. 2007) (*en banc*) (holding concepts of merger do not apply when defendant commits multiple distinct criminal acts). Thus, the court properly imposed a separate, concurrent sentence for Appellant's EWOC conviction. Accordingly, we affirm the judgment of sentence on the basis of the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/15/2016

## IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
## CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   :    CP-51-CR-0009793-2013

                                 :

v.        CP-51-CR-0009793-2013 Comm. v. Cabrera, Samuel N.    **SUPERIOR COURT**
                      Opinion



SAMUEL N. CABRERA       7351092121       **511 EDA 2015**

**FILED**

SEP 3 0 2015

Criminal Appeals Uni.
First Judicial District of P.

## OPINION

**Byrd, J.**                                         **September 30, 2015**

Samuel N. Cabrera filed a direct appeal from this court's January 16, 2015 judgment of sentence. In accordance with the requirements of PA. R.APP. PROC. 1925, this court submits the following Opinion.

## I. PROCEDURAL HISTORY

Defendant Samuel N. Cabrera was arrested on April 11, 2013 and charged with a range of offenses.[1] After waiving a jury trial, defendant was tried by this court, commencing on November 12, 2014. On November 13, 2014 defendant was found guilty of murder of the third degree, involuntary manslaughter and endangering the welfare of a child. On January 16, 2015 defendant was sentenced to an aggregate twenty (20) - forty (40) years of state incarceration.[2] Appellate counsel filed a Notice of Appeal on defendant's behalf on February 13, 2015. This court issued an order on February 17, 2015 directing defendant to file a Statement of Matters Complained of on Appeal in accordance with

---

[1] Defendant was charged with murder of the third degree (18 PA. CONS. STAT. ANN. § 2502(c)); involuntary manslaughter § 2504 (a); and endangering the welfare of a child § 4304 (a)(1).
[2] Defendant received a sentence of twenty (20) - forty (40) years of confinement for the charge of murder of the third

PA. R.APP. PROC. 1925 (b). On March 10, 2015, defendant filed said statement along with a Motion

for an Extension of Time to File a Supplemental Statement of Errors Complained of on Appeal after

receipt of the completed notes of testimony. On May 14, 2015 an extension to file was granted until

June 4, 2014, on which date said statement was timely filed.

## II. FACTUAL BACKGROUND

During the trial evidence was presented which when viewed in the light most favorable to the

Commonwealth as the verdict winner established the following.

In 2013 defendant Samuel Cabrera resided at 618 N. 63rd Street in Philadelphia,

Pennsylvania with his fiancée, Jennifer Wycoff and her children, seven-year-old A.W.V.,

six-year-old A.W. four-year-old B.W., , sixteen-month-old G.W.,

and three-month-old S.C. , the decedent. Also living in the home were

Ms. Wycoff's mother, Gabriella and Ms. Wycoff's grandmother, "Toto." *N.T.* 11/7/2014 at 15; *N.T.*

11/12/2014 at 140. S.C. was born in January, 2013 in the Lankenau Medical Center

where he was diagnosed with Neonatal Abstinence Syndrome (NAS)[3], as a result of exposure to

methadone, methamphetamines and marijuana prior to birth, and admitted into the Neonatal

Intensive Care Unit (NICU). *N.T.* 11/7/2014 at 15-16, 67; N.T. 11/12/13 at 83-84. He remained in

the NICU at Lankenau from January 2013 to March 26, 2013, for a total of seventy-six days before

he was discharged into the custody of defendant and Ms. Wycoff. *N.T.* 11/12/2014 at 82, 84.[4] On

March 26, 2013, the day of discharge, both defendant and Ms. Wycoff received special instructions

---

degree, of which involuntary manslaughter was merged and a concurrent two and one-half (2.5) - five (5) years on the charge of endangering the welfare of a child.

[3] NAS occurs when a baby goes through drug withdrawal and requires medical monitoring. *N.T.* 11/12/2014 at 84.

[4] Defendant and Ms. Wycoff visited S.C. a total of seven days including the day he was discharged into their care. *N.T.* 11/12/2014 at 85.

2

*Commonwealth v. Samuel Cabrera*

regarding necessary developmental and follow-up care, including an instruction to take S.C. to his pediatrician within two to four days after discharge from Lankenau Medical Center. *Id.* at 86.

On April 9, 2013 at 11:00 a.m., fourteen days after discharge, defendant and S.C.'s grandmother took him to his pediatrician, Dr. Mangano for a follow-up visit. *N.T.* 11/7/2014 at 16; *N.T.* 11/12/13 at 103. Immediately afterwards, at approximately 12:00 p.m., S.C. was taken back home where defendant took him upstairs and laid him in his playpen. *N.T.* 11/7/2014 at 17; *N.T.* 11/12/2014 at 141-142. Defendant then went back downstairs where the grandmother was cooking and both adults later went outside together. *N.T.* 11/12/2014 at 141-142. At about 1:45 p.m., defendant heard S.C. crying, and he brought the child downstairs to change his diaper. 11/7/2014 at 17; *N.T.* 11/12/2014 at 142. Afterwards, S.C. fell asleep and defendant took him back upstairs and laid him on the bed in Ms. Wycoff's bedroom. *Id.* Defendant then left the baby in the care of the child's grandmother. 11/7/2014 at 17; *N.T.* 11/12/2014 at 142, 172.

When defendant returned around 3:20 p.m., Ms. Wycoff had just arrived home with the other children. *N.T.* 11/7/2014 at 18; *N.T.* 11/12/2014 at 142, 172; *N.T.* 11/13/2014 at 11. Upon her arrival, S.C. was crying loudly and defendant went upstairs with A.W.V. following behind him. *N.T.* 11/13/2014 at 12. After defendant entered Ms. Wycoff's bedroom, where S.C. was crying, he pushed A.W.V. out of the room and closed the door behind him. *N.T.* 11/13/2014 at 13. A.W.V. testified[5] that she subsequently heard defendant yell at S.C. and tell him to be quiet, before she heard the child crying and choking. *N.T.* 11/13/2014 at 14-15. A.W.V. further testified that she called her mother upstairs, who tried but could not open the bedroom door. *N.T.* 11/13/2014 at 14. A.W.V. then ran downstairs and minutes later Ms. Wycoff ran downstairs holding a black and blue S.C. in her arms while screaming and crying that he was cold and

3

was not breathing. *N.T.* 11/7/2014 at 18-19; *N.T.* 11/12/2014 at 143,170-171; *N.T.* 11/13/2014 at 17-18. At some point, defendant attempted to perform untrained CPR on  *S.C.*  and at approximately 3:43 p.m. Ms. Wycoff dialed 911. *N.T.* 11/7/2014 at 19; *N.T.* 11/12/2014 at 111-112, 143, 171-73. Paramedics were dispatched at about 3:48 p.m. and arrived at the residence approximately five minutes later. *N.T.* 11/7/2014 at 113-114. Defendant was standing outside the residence holding *S.C.* who was not breathing, very pale, cold and in a serious condition. *Id.* at 115. The paramedics immediately placed *S.C.* in the back of the ambulance, began CPR and attempted to intubate and ventilate him. *Id.* at 116, 121-122. While the paramedics administered medications to *S.C.* and after showing defendant the proper way to administer CPR, they asked defendant to take over chest compressions for approximately thirty seconds. *Id.* at 116-117, 124. The paramedics continued CPR the entire way to the hospital. *Id.* at 118. En route to the hospital *S.C.* had a very faint pulse. *Id.* at 117. They arrived at the Children's Hospital of Philadelphia (CHOP) at approximately 4:15 p.m. *Id.*

Later that evening, around 10:00 p.m., Officer Gregory Meissler and Detective Daria Jackson of the Special Victims Unit arrived at CHOP after receiving the report of a baby in the Intensive Care Unit with signs of abuse. *N.T.* 11/7/2014 at 9-10; *N.T.* 11/12/2014 at 137. Upon arrival, the officers observed defendant and Ms. Wycoff in a conference room speaking with Department of Human Services and hospital social workers. *N.T.* 11/7/2014 at 11. Defendant was asked to accompany Officer Meissler into a small family room and Ms. Wycoff was asked to accompany Detective Jackson into a different family room in the same facility. *Id.* at 11, 30-31. Officer Meissler asked defendant questions regarding the cause of *S.C.'s* injuries and wrote down both the

---

[5] At trial *A.W.V.* testified and an admissible portion of her videotaped October 28, 2013 interview with the Philadelphia Children Alliance was played. *N.T.* 11/13/2014 at 5-21.

4

*Commonwealth v. Samuel Cabrera*

questions and answers as close to verbatim as he could.[6] *Id.* at 12; *N.T.* 11/12/2014 at 139-140. Defendant reviewed, signed and dated the handwritten interview, attesting to its veracity on April 9, 2013 at 10:45 p.m. *N.T.* 11/7/2014 at 14; *N.T.* 11/12/2014 at 143-144. Officer Meissler testified that defendant was not given Miranda warnings prior to being questioned because defendant was not in custody. *N.T.* 11/7/2014 at 19. He further stated that prior to conducting the informational interview he had only been informed that S.C. sustained multiple severe non-accidental internal injuries as a result of inflicted trauma, but neither defendant nor Ms. Wycoff were suspects. 11/7/2014 at 20. By 12:12 a.m. on April 10, 2013 S.C. was pronounced dead. *N.T.* 11/7/2014 at 44; *N.T.* 11/12/2014 at 41, 144.

On the evening of April 10, 2013 around 6:50 p.m. defendant and Ms. Wycoff were transported to the Philadelphia Homicide Unit. *N.T.* 11/7/2014 at 42, 54; *N.T.* 11/12/2014 at 154-55. Defendant was taken to an interview room, where he was first given *oral* Miranda rights prior to Homicide Detective William Sierra and his partner initiating the interview or taking any handwritten notes. *N.T.* 11/7/2014 at 52; *N.T.* 11/12/2014 at 155. Detective Sierra testified that when defendant was asked how S.C. received the injuries, he stated that he wanted his response to be "off the record." *N.T.* 11/7/2014 at 55; *N.T.* 11/12/2014 at 157. Defendant then stated that he was carrying S.C. up the steps when he tripped on loose carpeting and dropped the baby twice. *N.T.* 11/7/2014 at 55; *N.T.* 11/12/2014 at 157. Detective Sierra then replied "if that's your story, we'll take it, but we'll be able to prove scientifically and medically that's not how the injuries were sustained." *N.T.* 11/12/2014 at 157. Defendant was subsequently given *written* Miranda warnings at 10:19 p.m. During this interview, Detective Sierra explained that they were going to discuss the death of three-month-old S.C. before he read defendant his Miranda rights. *N.T.* 11/7/2014 at 57-61; *N.T.*

---

[6] The interview was later memorialized and typed. *N.T.* 11/7/2014 at 13.

5

*Commonwealth v. Samuel Cabrera*

11/12/2014 at 159. Defendant stated that he fully understood his rights as they were explained to him. 11/7/2014 at 68; *N.T.* 11/12/2014 at 160-164. Defendant signed and dated the formal Miranda warnings sheet at 10:27 p.m. *N.T.* 11/7/2014 at 57-61; *N.T.* 11/12/2014 at 159.

Detective Sierra further testified that as the interview became more formal, defendant's upset demeanor seemed to be relieved. *N.T.* 11/7/2014 at 64. When asked "do you know who is personally responsible for the sudden death of your son?[,]" defendant stated "[y]es, but it was an accident. I swung at my dog to get him away from the baby and I hit my son in the side [twice] because the dog wasn't listening." *N.T.* 11/7/2014 at 68; *N.T.* 11/12/2014 at 164. When asked to further explain what happened to    S.C.,   defendant provided the following account of events:

> I brought my son upstairs to lay him down . . . I laid him in our bed in our room. The first middle bedroom is our room . . . I then went downstairs and I let my dog in from the front porch. I came in and opened the door and he jetted upstairs. That's what he normally does anyways because he sleeps in our room . . . I come upstairs and I was yelling for him. The dog pushed the rest of the door open to let himself in our bedroom. I was calling him telling him to get off the bed, get off the bed. He doesn't listen all the time. He didn't listen, so I went to swing at him so he knows to jump off the bed. And then I went to punch at his back legs, he jumped out of the way and I hit my son . . . in his right side . . .twice. I didn't mean to[sic], I really didn't. The first time . . . I swung my left hand (indicating using the inside part of a closed fist" striking my baby on his left arm . . . When I hit him with the first punch I just thought I knocked the wind out of him by accident. I was trying to get the dog off the bed not realizing that my son was having trouble breathing. Not until I swung at the dog and he jumped off the bed, and ran back downstairs did I realize that my son was out of breath; like when someone hits us in our stomach . . . I didn't think anything was severely wrong with him . . . so I put pressure on his chest and stomach . . . he started breathing normal again . . . all he did was cry. So I gave him his bottle, he drank some milk, and he fell asleep. I didn't think nothing was wrong with him. Then I left to get the girls from school . . . When I got home, I went upstairs and checked on the baby. He looked fine so I came downstairs . . . My wife went upstairs with the other two young girls, the four and six year old . . . she came downstairs carrying the baby crying, saying he was cold, he wasn't breathing and that his skin color

6

was really light. . . I started CPR. I panic[ked] because I didn't call the ambulance or doctor knowing that my son stopped breathing because of me.[7]

*N.T.* 11/12/2014 at 167-171. When detectives asked defendant if he had any additional statements, he stated ". . . I don't have money for bail and S.C.'s funeral." *Id.* at 174. Defendant signed a consent to a video statement on April 11, 2013 at 1:26 a.m. *N.T.* 11/7/2014 at 73; *N.T.* 11/12/2014 at 176. Later, while defendant was alone in the interview room, awaiting formal charges, detectives found him with blood on his shirt. *N.T.* 11/7/2014 at 76; *N.T.* 11/12/2014 177-178. When asked what happened, defendant stated to detectives that the injury "was no big deal[,]" he bit the inside of his jaw. *Id.* On the same day, after defendant was informed that he would be formally charged with the murder of his son, detectives found defendant lying in a pool of blood of his own making. *N.T.* 11/7/2014 at 77; *N.T.* 11/12/2014 at 178.

At trial the parties stipulated that on August 24, 2013 defendant, while incarcerated awaiting trial in this matter, placed a phone call from prison to an unknown male wherein he provided a third alternative for S.C.'s injuries. *N.T.* 11/12/2014 at 190. On the prison tape, defendant stated that at some point before picking up the children from school, he returned home and noticed that the doors to his home were open and that an intruder had broken in. *Id.* Defendant also stated that upon hearing S.C. crying, he ran upstairs and the male intruder hit him from behind and then pointed a gun at him. Defendant further stated that the male intruder then ran into the room with the child, defendant heard S.C. scream, and the intruder ran out. *Id.* Defendant concluded by stating that before the intruder exited the house, he threatened defendant that if he told anyone what happened he would kill "a family member." *Id.*

---

[7] At trial, A.W.V. testified that the family dog remained on the porch during the incident that led to S.C.'s death. *N.T.* 11/13/2014 at 21.

7

*Commonwealth v. Samuel Cabrera*

Dr. Mark Mangano, S.C.'s pediatrician, examined him twice ante-mortem and testified as the Commonwealth's expert in the field of pediatric medicine. *N.T.* 11/12/13 at 97. Dr. Mangano first saw S.C. on April 5, 2013 after his office was contacted by the Lankenau Hospital care team, who also contacted the Department of Human Services (DHS), to schedule the appointment. *N.T.* 11/12/13 at 88-89, 99. Dr. Mangano testified that during S.C.'s examination, he was irritable and cried for most of the visit, as expected from a baby with NAS, but he was also consolable and settled down after careful soothing. *Id.* at 100-101. Dr. Mangano opined that irritability and crying caused by a healing rib and clavicle fracture would be very difficult to distinguish from NAS associated irritability. *Id.* at 102. Because S.C. had loss a significant amount of weight since being discharged from Lankenau, he changed the baby's feeding regime and scheduled a follow-up visit for April 9, 2013. *Id.* at 101-102.

Dr. Aaron Rosen, an Assistant Medical Examiner, performed an autopsy on S.C.'s body and prepared a report based on his findings and information received from the Children's Hospital of Philadelphia (CHOP). *N.T.* 11/12/2014 at 38-40. Dr. Rosen, the Commonwealth's expert in forensic pathology, concluded to a reasonable degree of medical certainty the child's death was caused by multiple blunt impact injuries, and that the manner of death was homicide. *Id.* at 41. During the autopsy Dr. Rosen observed and reported the following external and internal injuries: abrasions and contusions (scrapes and bruises) below, above and adjacent to S.C.'s right and left eye and on his upper eyelid and right cheek. *Id.* at 42. Observation of S.C.'s torso revealed a large area of pinkish red and several other contusions and scattered abrasions over his abdomen and mid-chest area. *Id.* at 42-43. There were also several contusions on S.C.'s extremities, specifically his left thigh, lower right knee, left foot, and toes and a laceration on his right heel. *Id.* at 43. S.C. also suffered several severe internal injuries including five rib

8

fractures and a fractured clavicle (collar bone). *Id.* at 44-46. One of the rib fractures and the fractured

collar bone showed evidence of new bone formation on top of old fractures which led Dr. Rosen to

conclude that there had been prior injury. *Id.* at 46-47.

Dr. Rosen also observed several significant lacerations on S.C.'s liver, one of which

was five centimeters long and the full thickness of the liver damaging multiple blood vessels. *Id.* at

47-48. The laceration's size led Dr. Rosen to opine that a severe amount of blunt trauma was used to

cause that amount of damage to the liver. *Id.* at 48. Dr Rosen explained that the trauma to the liver

caused a hemorrhage and blood entered the abdominal cavity. *Id.* at 49. Further observation of the

internal injuries led Dr. Rosen to conclude that exsanguination from heavy bleeding out of the

circulatory system and vessels into the abdomen resulted in significant blood loss and led to death.

*Id.* at 50. Dr. Rosen testified that abdominal compartment syndrome (ACS) caused S.C. to

go into shock and stop breathing. *Id.* Dr. Rosen also described the efforts CHOP took in an attempt

to save S.C.'s life, which included an operation, resuscitation and an incision in an attempt

to open the abdomen and relieve the bleeding and trauma. *Id.* at 51-53. Thus, external examination

revealed some bruising from medical intervention and possibly CPR. *Id.* at 53-54.[8]

Dr. Rosen explained that the elasticity of children's bones makes them very difficult to

fracture and doing so would require a significant amount of force. *Id.* at 57. He also added that such

force often occurs during a vehicular accident and is rarely the result of improper CPR. *Id.* Dr. Rosen

testified that defendant walking up the steps with S.C. in his arms, tripping and dropping the

baby would not explain the injuries he observed. *Id.* at 58. On the contrary, Dr. Rosen confirmed that

defendant punching S.C. at least twice[9] would be consistent with the injuries suffered. *Id.*

---

[8] Dr. Rosen however noted that CPR only accounted for some of the injuries on S.C.'s mid-chest region and did not explain the other significant injuries to rest of the body. *N.T.* 11/12/13 at 50.

[9] Dr. Rosen further explained that if S.C. was on a soft surface it would have likely taken more than two blows to

9

*Commonwealth v. Samuel Cabrera*

Dr. Rosen opined that S.C. would have stopped breathing approximately twenty minutes after the injuries were inflicted. *Id.* at 60. Finally, phenobarbital, a common medication used to treat NAS and help babies get over addictions to drugs ingested during pregnancy to prevent withdrawal symptoms, was found in S.C.'s system at autopsy. *N.T.* 11/12/13 at 99.

## III. STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In accordance with PA. R.APP. PROC. 1925 (b) defendant raised the following issues in his Statement of Matters Complained of on Appeal.[10]

a. The evidence presented by the Commonwealth was insufficient to prove beyond a reasonable doubt that appellant was guilty of third degree murder in that there was insufficient evidence of appellant's *mens rea* to prove malice.

b. The Motions Court erred as a matter of law and violated appellant's rights under the federal and state constitutions when it denied his motion to suppress the statement given to P.O. Meissler from the SVU where appellant was not warned of his rights pursuant to Miranda prior to interrogation under circumstances under which any reasonable person would not have felt free to leave and thus was the equivalent of custody for Miranda purposes.

c. The Motions Court erred as a matter of law and violated appellant's rights under the federal and state constitutions when it denied his motion to suppress his formal written statement and video statement (C-4; C-4A) as they were taken subsequent to a non-mirandized verbal statement and thus tainted.

d. The Motions Court erred and abused its discretion by denying appellant's motion to preclude the prison tape from being played during the trial as it was not relevant or probative as it was, for example, neither an admission by a party opponent as to intent, or impeachment evidence, where appellant's defense was that the act which led to the death of his son was not done with malice and thus did not rise to third degree murder.

e. The Motions Court erred and abused its discretion by granting the Commonwealth's motion to allow the video of child witness A.W.V. to be shown at trial and admitted into evidence, as it failed to meet the reliability criteria of the Tender Years Hearsay Act.

---

cause the injury, as opposed to if he was on a hard surface, like the ground. *N.T.* 11/12/13 at 59. He reasoned that sometimes children fall or are dropped and do not suffer injuries remotely similar to S.C.'s *Id.*

[10] The statement below was taken verbatim from defendant's filed Statement of Errors

*Commonwealth v. Samuel Cabrera*

Defendant now challenges the sufficiency of the evidence to support the verdict of murder in the third degree. Further, he also challenges rulings of the motions court, including the denial of his motion to suppress. Although this court did not preside over the motions hearing in this case, a thorough review of the record and notes of testimony, reveals that defendant's claims lack merit.

Our Supreme Court "has long recognized that judges of coordinate jurisdiction sitting in the same case should not overrule each others' decisions." *Commonwealth v. Starr*, 541 Pa. 564, 573-74 (1995). "This rule, known as the "coordinate jurisdiction rule," is a rule of sound jurisprudence based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency." *Id.* The "coordinate jurisdiction rule falls squarely within the ambit of a generalized expression of the "law of the case" doctrine." *Id.* at 574. "This doctrine refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." *Id.* "Among the related but distinct rules which make up the law of the case doctrine are that . . . upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court." *Id. See Commonwealth v. Washington*, 428 Pa. 131, 133 n. 2, 236 A.2d 772, 773 n. 2 (1968) (citation omitted) (a trial judge cannot reverse on the same record at trial the decision made after the pretrial suppression hearing that defendant's statement need not be suppressed); *Commonwealth v. Rolan*, 2008 PA Super 291, 964 A.2d 398, 404 (2008) (in permitting testimony, trial court was following the pretrial ruling of a judge of the same court of common pleas).

## A. Sufficiency of the evidence

"In considering a challenge to the sufficiency of the evidence, the Court must decide whether

11

*Commonwealth v. Samuel Cabrera*

the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences there from, could enable the fact-finder to find every element of the crimes charged beyond a reasonable doubt." *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (citations omitted). "In assessing the sufficiency of evidence, a reviewing court may not weigh the evidence and substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence." *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). "The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001), *appeal denied*, 806 A.2d 858 (Pa. 2002). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Commonwealth v. Cassidy*, 668 A.2d 1143, 1144 (Pa. Super. 1995), *appeal denied*, 681 A.2d 176 (Pa. 1996) (citation omitted). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Id.* "Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered." *Commonwealth v. Muniz*, 5 A.3d 345, 348 (Pa. Super. 2010), *appeal denied*, 19 A.3d 1050 (Pa. 2011) (citation omitted). Finally, "[i]f the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (citation omitted).

Here, defendant challenges his conviction for third-degree murder. Specifically, defendant claims that "[t]he evidence presented by the Commonwealth was insufficient to prove beyond a reasonable doubt that [he] was guilty of third degree murder in that there was insufficient evidence of appellant's *mens rea* to prove malice." Statement of Errors ¶ a. This claim is without merit.

12

In this case, the Commonwealth proved beyond a reasonable doubt that defendant brutally beat his infant son to death. To sustain a conviction for murder of the third degree, "the Commonwealth need only prove that the defendant killed another person with malice aforethought." *Commonwealth v. Fisher*, 622 Pa. 366, 375 (2013), *cert. denied sub nom., Best v. Pennsylvania*, 134 S. Ct. 2314 (2014) (internal citations omitted). Our Supreme Court has held that "malice comprehends not only a particular ill-will, but ... [also a] wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Fisher*, 622 Pa. at 375. Thus, "[m]alice exists where the principal acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury." *Commonwealth v. Kellam*, 719 A.2d 792, 797 (Pa. Super. 1998). Likewise, "[m]alice may also exist where the omission or failure to perform a legal duty was willful and will probably result in the death of the victim." *Id.* Moreover, "third-degree murder is a killing done with legal malice but without the specific intent to kill required in first-degree murder." *Commonwealth v. Kellam*, 719 A.2d 792, 797 (Pa. Super. 1998). In short, the Court has noted that:

> [T]hird degree murder is not a homicide that the Commonwealth must prove was committed with malice and without a specific intent to kill. Instead, it is a homicide that the Commonwealth must prove was committed with malice, but one with respect to which the Commonwealth need not prove, nor even address, the presence or absence of a specific intent to kill. Indeed, to convict a defendant for third degree murder, the jury need not consider whether the defendant had a specific intent to kill, nor make any finding with respect thereto.

*Fisher*, 622 Pa. at 375 (citations omitted).

The evidence as discussed below shows that defendant provided three different versions of events in an attempt to mask the truth, that he was alone with   S. C.   when the child sustained several fatal injuries of a brutal nature as detailed in the autopsy report. Indeed, Dr. Aaron Rosen

13

testified to a reasonable degree of medical certainty that the baby's death was caused by multiple blunt impact injuries. *N.T.* 11/12/2014 at 38-40. Dr. Rosen described several severe internal injuries to S.C., including five rib fractures, and a fractured collar bone. *Id.* at 44-46. Dr. Rosen also described several significant lacerations on S.C.'s liver, one of which was five centimeters long, the full thickness of the liver, caused by a severe amount of blunt trauma. *Id.* Additionally, Dr. Rosen explained how one of the rib fractures and the fractured collar bone had new bone formation on top of old fractures which showed that there had been prior injury. Dr. Rosen further stated that the elasticity of children's bones makes them very difficult to fracture, and the injuries suffered by S.C. required a significant amount of force that is often the result of a vehicular accident. *Id.* at 57.

Further, evidence to support the verdict of murder in the third-degree must include the three different versions of events defendant provided on three separate occasions to explain S.C.'s injuries. To account for the severe internal injuries that S.C. suffered, including five rib fractures and a fractured collar bone, defendant first stated to homicide detectives that he accidentally dropped the child twice while carrying him on the steps. When Detective Sierra responded that a medical examination would be able to disprove that account, defendant created a different account of what happened. Defendant proceeded to tell detectives that while trying to remove the family dog from the bed S.C. was lying on he accidentally punched the child twice and neglected to seek medical attention after observing him in distress. Defendant stated to detectives, "I swung my left hand (indicating using the inside part of a closed fist) striking my baby on his left arm. . . When I hit him with the first punch I just thought I knocked the wind out of him by accident." Allegedly, after punching S.C. defendant did not immediately realize that the child was having trouble breathing, so he did not seek medical attention. However, once defendant realized that S.C.

14

*Commonwealth v. Samuel Cabrera*

was out of breath "like when someone hits us in our stomach[,]" although he "didn't think anything was severely wrong with him. . . [he] put pressure on S.C.'s chest and stomach" until he began to cry, but still did not "call [an] ambulance or doctor knowing that [his] son stopped breathing because of [him]." Clearly that conduct and subsequent failure to obtain immediate medical care for his son meets the *Kellam* standard of culpability. Especially when in reality, young A.W.V. testified that the dog was downstairs on the porch when she followed defendant upstairs. She further testified that defendant pushed her out of the bedroom but that she heard defendant tell S.C. to be quite, followed by the child choking and gasping for air. Finally, while incarcerated and awaiting trial defendant concocted yet a third version of events in which he blamed the child's injuries on an armed intruder.

Assuming arguendo that it was not defendant's conscious purpose to bring about the death of S.C. the convincing evidence shows that defendant acted in gross deviation from the standard of reasonable care and failed to perceive that his actions might create a substantial and unjustifiable risk of death or serious bodily injury to S.C. . Moreover, by his own admission, defendant's conduct constituted malice in that he failed to perform his parental duties to obtain medical care immediately after noticing that S.C. was having trouble breathing. "I started CPR. I panic[ked] because I didn't call the ambulance or doctor knowing that my son stopped breathing because of me." Thus, malice existed not only where defendant willfully struck his infant son multiple times, but also where his willful omission and failure to perform his parental duty resulted in the death of his son.

Thus, it is indisputable that the Commonwealth has proven that the defendant killed S.C. with malice aforethought. First, as stated above, defendant was alone with S.C. when the child sustained a brutal beating resulting in death. Additionally, not only did defendant's

15

actions reflect malice aforethought, but his failure to act also manifested ill-will and a wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty evidencing malice.

### B. Motions to Suppress

"In reviewing a ruling on a suppression motion, the standard of review is whether the factual findings and legal conclusions drawn therefrom are supported by the evidence." *Commonwealth v. Kuzmanko*, 709 A.2d 392, 396 (Pa. 1998). "[W]here the record supports the findings of the suppression court, [the reviewing court] is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Id.* Thus the Superior Court considers "whether the suppression court properly applied the law to the facts of the case." *Commonwealth v. Ruey*, 586 Pa. 230, 240 (2006). "In reviewing the denial of a [defendant's] motion to suppress evidence, [the Superior Court] consider[s] only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *In re J.V.*, 762 A.2d 376, 379 (Pa. Super. 2000) (citations omitted). "Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." *Commonwealth v. Wallace*, 615 Pa. 395, 407 (2012) (citing PA. R.CRIM. PROC. 581(H)).

To begin, defendant claims that he was deprived of his federal and state constitutional rights "where [he] was not warned of his rights pursuant to Miranda prior to interrogation under circumstances under which any reasonable person would not have felt free to leave and thus was the equivalent of custody for Miranda purposes." Statement of Errors ¶ b. For the reasons stated below, this claim is meritless.

16

"[I]t is well-settled that the police are only required to advise a person of his *Miranda* rights if that person is subjected to custodial interrogation." *Commonwealth v. Busch*, 713 A.2d 97, 100 (Pa. Super. 1998). Thus, to "trigger the safeguards of *Miranda,* there must be both custody and interrogation." *Commonwealth v. Cruz*, 71 A.3d 998, 1003 (Pa. Super. 2013). "As a general rule, the prosecution may not use statements, whether inculpatory or exculpatory, stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel." *Commonwealth v. Umstead*, 916 A.2d 1146, 1149 (Pa. Super. 2007). "[P]olice detentions in Pennsylvania become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest." *Commonwealth v. Turner*, 772 A.2d 970, 973 (Pa. Super. 2001) (citations omitted). An arrest is defined as "an act that indicates an intention to take a person into custody or that subjects the person to the will and control of the person making the arrest." *Commonwealth v. Gwynn*, 555 Pa. 86, 723 A.2d 143, 148 (1998).

The Superior Court has noted that "[a]n interrogation for the purposes of Miranda refers not only to express questioning, but also to any words or actions on the part of police (other than normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth v. Turner*, 772 A.2d 970, 974 (Pa. Super. 2001) "Interrogation is defined as "police conduct calculated to, expected to, or likely to evoke admission." *Commonwealth v. Snyder*, 60 A.3d 165, 170 (Pa. Super. 2013), *appeal denied*, 620 Pa. 731 (2013). In effect, "[t]he test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Commonwealth v. Chacko*, 500

17

Pa. 571, 577 (1983) (citations omitted). Simply put, "[t]he test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted." *Id.* The Superior Court has observed that:

> The factors that the court considers to determine whether there has been a custodial interrogation include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

*Commonwealth v. Turner*, 772 A.2d 970, 973 (Pa. Super. 2001).

In this case, Officer Meissler responded to a report of suspected abuse regarding a baby in the Intensive Care Unit at CHOP and went to the hospital in order to conduct an informational interview and gather the facts surrounding the incident. Officer Meissler arrived at the hospital and questioned defendant, the father of the victim, as part of a routine investigation of child abuse allegations. Defendant remained on the same floor where S.C. was being treated and was questioned about the incident in a non-threatening manner in a hospital family room. Defendant gave a statement detailing his account of events on the day of the incident. However, he never mentioned that he inflicted any injury to S.C. At the motions hearing, defendant argued that the foregoing amounted to a custodial interrogation which triggered the necessity of Miranda warnings because a reasonable person under those circumstances would not have felt free to leave. *N.T.* 11/7/13 at 93-94. Defendant conceded that he was not in a police station or handcuffed. However, he argues that Officer Meissler did not explicitly inform him that he was free to leave and the alleged detention amounted to the functional equivalent of an arrest which physically deprived him of his freedom while he was subject to interrogation. *Id.* To the contrary, the prosecutor argued that defendant was not subject to custodial interrogation. *Id.* at 95-96. Further, the prosecutor argued that

18

defendant was not a suspect, and he was merely being questioned for investigative and fact gathering purposes. *Id.*

In denying defendant's motion to suppress the statement, the motions court correctly reasoned that defendant's treatment was the same as any other witness during the early stages of an investigation. *Id.* at 97. The motions court held that even if the questioning escalated into an interrogation, defendant was not in custody. The motions court held that, under the totality of the circumstances, defendant cannot be said to have been in custody because the conditions and duration of the questioning never became so coercive as to constitute the functional equivalent of arrest. Moreover, in attempting to gather an accurate account of the facts, Officer Meissler had no reason to believe that the questions he asked were reasonably likely to elicit an incriminating response from defendant. *See Commonwealth v. Fento,* 363 Pa. Super. 488 (1987) (holding that police officer's questioning of driver as part of routine accident investigation while driver was being treated in hospital was not "custodial interrogation" requiring Miranda warnings).

In sum, the motions court concluded that defendant was not subject to custodial interrogation for the following reasons: the length of the interview was not excessive, its location was a nonthreatening hospital family room, defendant was not coerced against his will, no restraints were used, Officer Meissler did not show, threaten or use force, and defendant was not a suspect at the time of the interview. Thus, defendant was not entitled to Miranda warnings.

Defendant next challenges his formal written and video statement given to homicide detectives. Specifically, he claims "his formal written statement and video statement . . . were taken subsequent to a non-mirandized verbal statement and [are] thus tainted." Statement of Errors ¶c. This claim also lacks merit. Evidence is "fruit of the poisonous tree" and thus subject to suppression if the evidence comes to light by way of exploitation of the illegality and was generally inadmissible

19

*Commonwealth v. Samuel Cabrera*

at trial. *Commonwealth v. Abbas*, 862 A.2d 606, 610 (Pa. Super. 2004) (citing Commonwealth v. Brown, 700 A.2d 1310 (Pa.Super.1997); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

The evidence at the motions hearing established that defendant was transported to the homicide unit on August 10, 2013 around 6:50 p.m. *N.T.* 11/7/2014 at 42, 54; *N.T.* 11/12/2014 at 154-55. Detective William Sierra testified that after arrival, defendant was taken to an interview room where he was first *orally* advised of his Miranda rights from the standard police interrogation form and asked whether he wished to waive his rights. *Id.* Only after indicating that he wished to waive his rights did the interview commence. *N.T.* 11/7/2014 at 55. Defendant subsequently gave his first explanation for S.C.'s injuries, and stated that the child was injured when defendant tripped on loose carpeting and dropped him twice. *N.T.* 11/7/2014 at 55. Detective Sierra then replied "if that's your story, we'll take it, but we'll be able to prove scientifically and medically that's not how the injuries were sustained." *N.T.* 11/12/2014 at 157.

Detective Sierra further testified that defendant was later given formal *written* Miranda warnings at 10:19 p.m. During the issuance of these warnings Detective Sierra explained to defendant that they were going to discuss the death of three-month-old S.C., and then read defendant his Miranda rights. *N.T.* 11/7/2014 at 57-61. Defendant also read the warnings and waived them in writting before signing and dating the forms at 10:27 p.m. *Id.* Detective Sierra testified that each time defendant was issued Miranda rights, both oral and written, defendant stated that he fully understood his rights as they were explained to him and responded with identical answers. *N.T.* 11/7/2014 at 68. When defendant was asked "do you know who is personally responsible for the sudden death of your son?[,]" defendant stated, "[y]es, but it was an accident. I swung at my dog to

20

get him away from the baby and I hit my son in the side [twice] because the dog wasn't listening." *N.T.* 11/7/2014 at 68. Significantly, at the conclusion of defendant's interview, after reviewing his statement and prior to signing the video statement consent form, when asked how he thought he was treated by the detectives, defendant responded "[f]air, I could have been treated worse. Due to the circumstances, I was treated with respect and as a person, not for what was going on." *N.T.* 11/7/2014 at 71.

During the motions hearing, defendant conceded that he waived written Miranda warnings at approximately 10:30 p.m. but argued that despite Detective Sierra's testimony there is no evidence that he received oral Miranda warnings prior to making his first statement. *N.T.* 11/7/13 at 99. Defendant now claims that his formal written statements were made only subsequent to a non-mirandized oral statement and as such are tainted. The prosecutor countered by pointing out that Detective Sierra's oral administration of Miranda warnings, which was actually memorialized in defendants formal statement, negates the contention that defendant was not given the first set of Miranda warnings. *Id.* at 91, 99-100. Awarding deference to the credibility determination of the motions court, which found Detective Sierra to be "completely 100% credible," this court agrees that it is not an unreasonable practice to give initial Miranda warnings orally. *Commonwealth v. Hanible*, 836 A.2d 36, 40 (Pa. 2003) (finding that "credibility determinations are solely within the province of the fact-finder, and an appellate court may not reweigh the evidence and substitute its judgment for that of the finder of fact"). Thus, the record supports the motions court's finding that defendant was given Miranda warnings prior to both the informal oral interview and the subsequent formal written statement. *Id.* at 100.

Defendant alternatively claims that his waiver of the formal written Miranda rights was not voluntary. "The determination [of] whether an accused has knowingly and voluntarily waived his

21

constitutional rights depends on the facts of each particular case." *Commonwealth v. Cohen*, 53 A.3d 882, 886 (Pa. Super. 2012) (citations omitted). "It is [however] the Commonwealth's burden to establish whether a defendant knowingly and voluntarily waived his Miranda rights." *Id.* at 885-86. "In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." *Id.* The Superior Court has held that a defendant has "*explicitly waived* his *Miranda* rights by clearly *and unequivocally* indicating that he understood his rights and then responding to the officer's questions." *Id.* (emphasis added). "Our Supreme Court elaborated that an "explicit waiver" meant "an outward manifestation of a waiver such as an oral, written or physical manifestation." *Id.* For example, the Supreme Court has found that a defendant "sufficiently *manifested the intent to waive his rights*" where he "twice stating he understood his *Miranda* rights after they were read to him, and answer[ed] questions immediately."*Id.* (emphasis added). Likewise, our Supreme Court has also concluded that a "defendant sufficiently manifested his intent to waive his Miranda rights where those rights were read to him, he indicated *one time* that he understood them, and then he answered the questions asked by police." *Id.* (citing *Commonwealth v. Baez*, 21 A.3d 1280, 1282 (Pa. Super. 2011)) (emphasis added). Here, Detective Sierra testified that he read defendant his Miranda rights, after which defendant indicated that he understood those rights and agreed to answer the questions asked by the detective. Fully crediting Detective Sierra's testimony, the motions court found the absence of any "hint of involuntariness" in the issuance of both oral and written Miranda warnings. *N.T.* 11/7/2014 at 102. As the motions court noted, the above, coupled with viewing the video statement, eliminates any question as to whether defendant made a knowing and voluntary statement. *Id.* Indeed, during his Mirandized statement the defendant told "a story [complete with demonstrations] that, frankly, he had a lot of time to concoct." *Id.* Under our Miranda precedents, defendant

22

*Commonwealth v. Samuel Cabrera*

unequivocally manifested his intent to and did waive his Miranda rights. For the reasons discussed above, the findings of fact and conclusions of law made by the motions court are supported by the record.

Next, defendant asserts that the prison tape was not relevant or probative "where [his] defense was that the act which led to the death of his son was not done with malice and thus did not rise to third degree murder." Statement of Errors ¶ d. This claim lacks merit.

On a challenge to a trial court's evidentiary ruling, [the Superior Court's] standard of review is one of deference." *Commonwealth v. Herb*, 852 A.2d 356, 363 (Pa. Super. 2004). "Thus the Superior Court's standard of review is very narrow; reversal may only occur upon a showing that the trial court clearly abused its discretion or committed an error of law." *Id.* "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable . . . as shown by the evidence of record. *Commonwealth v. Cameron*, 780 A.2d 688, 692 (Pa. Super. 2001)." "The threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Stokes*, 78 A.3d 644, 654 (Pa. Super. 2013), *appeal denied*, 89 A.3d 661 (Pa. 2014). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Spiewak*, 533 Pa. 1, 8, 617 A.2d 696, 699 (1992). "In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact." *Stokes*, 78 A.3d at 654. "However, where the evidence is not relevant there is no need to determine whether the probative value of the evidence outweighs its prejudicial impact." *Id.* Under Pennsylvania law, generally, "[t]ape recordings are admissible in evidence when they are properly identified and are a true and correct reproduction of the statements made, and when the voices are properly identified."

23

*Commonwealth v. Johnson*, 450 Pa. 575, 578 (1973). "When properly identified as true and correct reproductions, and when the voices are properly identified, such tape recordings are admissible." *Commonwealth* v. *Leamer*, 449 Pa. 76, 82 (1972).

Here, defendant does not challenge the authenticity of the prison tape, nor does he argue that he is not correctly identified as the declarant. Instead, defendant suggests that the prison tape, on which he concocted yet a third alternative explanation as to how S.C. received his fatal injuries, was not relevant or probative because his "defense was that the act which led to the death of his son was not done with malice and thus did not rise to third degree murder." Certainly, the evidence in which defendant asserts that he did not actually inflict the injuries which led to S.C.'s death is relevant in that it logically tends to establish a material fact in the case, make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact—the presence or absence of malice. As the motions court explained, the prison tape is unequivocally relevant and admissible because it "presents [defendant] coming up with still another explanation for how S.C.'s injuries] happened, which has nothing to do with anything that he said in the prior admissible statements." *N.T.* 11/7/2015 at 125. Finally, the motions court found that the probative value of the prison tape with defendant's fabrication of a third alternative to S.C.'s fatal injuries far outweighed its prejudicial impact. Thus, absent overriding misapplication of the law or the exercise of judgment that is manifestly unreasonable, the motions court's evidentiary rulings must stand.

## C. Tender Years Hearsay Act

Finally, defendant raises an evidentiary claim under the Tender Years Hearsay Act. Specifically, defendant claims that "[t]he Motions Court erred and abused its discretion by granting the Commonwealth's motion to allow the video testimony of child witness A.W.V. [to

24

*Commonwealth v. Samuel Cabrera*

be shown at trial and admitted into evidence, as it failed to meet the reliability criteria of the Tender Years Hearsay Act." Statement of Errors ¶ e. For the following reasons, this claim lacks merit.

"An appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay and determinations of witness competency, is abuse of discretion." *Commonwealth v. Walter*, 93 A.3d 442, 449 (Pa. 2014) (citing *Commonwealth v. Delbridge,* 578 Pa. 641, 855 A.2d 27, 34 n. 8 (2003)). "Questions concerning the admissibility of evidence lie within the sound discretion of the trial court." *Commonwealth v. Lyons*, 833 A.2d 245, 255 (Pa. Super. 2003). The Superior Court "will not reverse the trial court's decision to admit evidence pursuant to the tender years statute absent an abuse of discretion." *Commonwealth v. Curley*, 910 A.2d 692, 697 (Pa. Super. 2006).

"Generally, a witness is presumed competent to testify, and the burden falls on the objecting party to demonstrate that a witness is incompetent." *Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014) (citing PA. R.EVID. 601 (b)) (holding that a child need not be deemed competent to testify as a witness in order for the trial court to admit the child's out-of-court statements into evidence pursuant to the Tender Years Hearsay Act). Under Rule 601(b), a person may be found incompetent to testify if the Court determines that, because of . . . immaturity, the person: "(1) is, or was, at any relevant time, incapable of perceiving accurately; (2) is unable to express himself or herself so as to be understood either directly or through an interpreter; (3) has an impaired memory; or (4) does not sufficiently understand the duty to tell the truth." PA.R.EVID. 601(b).

> However, where a child under the age of 14 is called to testify as a witness, the trial court must make an independent determination of competency, which requires a finding that the witness possess (1) a capacity to communicate, including both an ability to understand questions and to frame and express intelligent answers; (2) the mental capacity to observe the actual occurrence and the capacity of

25

remembering what it is that he or she is called to testify about; and (3) a consciousness of the duty to speak the truth.

*Walter*, 93 A.3d at 451. "Unlike a determination of competency, which pertains to a witness's capacity to testify, the Tender Years Hearsay Act concerns the admissibility of out-of-court statements made by a child victim or witness to third parties." *Id.* Our Supreme Court has held that "[t]he admissibility of this type of hearsay is determined by assessing the particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who is testifying." *Id.*

The tender years exception is codified at 42 PA. CONS. STAT. ANN. § 5985.1 and provides in relevant part:

> An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25 (relating to criminal homicide). . . not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:
> > (1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
> > (2) the child either:
> > > (i) testifies at the proceeding; or
> > > (ii) is unavailable as a witness.

42 PA. CONS. STAT. ANN. § 5985.1 (West). "Any statement admitted under § 5985.1 must possess sufficient indicia of reliability, as determined from the time, content, and circumstances of its making." *Commonwealth v. O'Drain*, 829 A.2d 316, 320 (Pa. Super. 2003). "There are several factors a court may consider in determining reliability under § 5985.1, including, but not limited to, "the spontaneity and consistent repetition of the statement(s); the mental state of the declarant; the use of terminology unexpected of a child of similar age; and the lack of a motive to fabricate." *Fidler v. Cunningham-Small*, 871 A.2d 231, 235 (Pa. Super. 2005).

26

*Commonwealth v. Samuel Cabrera*

> Thus, with respect to a child witness, one of the primary concerns Rule 601 is designed to address is a child's ability to *perceive and remember* events about which the child later testifies. Conversely, in determining whether out-of-court statements of a child contain "particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who is testifying," *Delbridge,* 855 A.2d at 45, and, therefore, are admissible under the TYHA, the focus is on the truthfulness of the statements, which is assessed by considering the spontaneity of the statements; the consistency in repetition; the mental state of the child; the use of terms unexpected in children of that age; and the lack of a motive to fabricate.

*Walter,* 93 A.3d at 452-53.

In the this case, the Commonwealth sought to introduce into evidence a DVD of the statement of then eight-year-old A.W.V. being interviewed by the Philadelphia Children's Alliance on October 28, 2013, six months after the murder. *N.T.* 11/7/2014 at 102-105. The video filmed only the children's alliance interviewer and the child witness, although the prosecutor, an appointed child advocate, assigned detective and a social worker from the children's alliance observed the interview from another room on a closed circuit television. *Id.* at 105-106.

Defendant argues that the video of child witness A.W.V. should not have been shown at trial or admitted into evidence because it failed to meet the reliability criteria of the TYHA. Statement of Errors ¶ e. After reviewing the TYHA and relevant case law, the motions court however, found that the DVD of A.W.V. interview and the evidence contained therein[11] met the statutory requirements. *N.T.* 11/10/2014 at 5. The motions court found, and this court agrees that said evidence was relevant and that the time, content and circumstances of the statement provided a sufficient indicia of reliability. *Id.* at 5-6. Based on the spontaneity and consistent repetition of the statement on the video which mirrored A.W.V.'s in court testimony, the competent mental state of

---

[11] The motions court did however exclude portions of the child witness's testimony that referenced allegations of abuse involving defendant and the witness's other younger siblings. *N.T.* 11/10/2014 at 6.

27

*Commonwealth v. Samuel Cabrera*

A.W.V. , the use of terminology expected of a child of similar age, and the lack of a motive to fabricate, this court finds truthfulness in the statements which were properly admitted by the motions court under the TYHA. *N.T.* 11/13/2014 at 1-7.

## V. CONCLUSION

For the aforementioned reasons, this court's judgment of sentence should be AFFIRMED.

BY THE COURT

September 30, 2015

SANDY L.V. BYRD, J.

28

*Commonwealth v. Samuel N. Cabrera*                    CP-51-CR-0009793-2013
                                                        511 EDA 2015

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Opinion upon the person(s), and in the manner indicated below, which service satisfies the requirements of PA. R. CRIM. PROC. 114:

Defense Counsel:       Isla A. Fruchter, Esquire
                       Assistant Defender, Appeals Division
                       Defender Association of Philadelphia
                       1441 Sansom Street
                       Philadelphia, PA 19102

Type of Service:       (x) First Class Mail        ( ) Certified    ( ) Personal Service

District Attorney:     Hugh J. Burns, Jr., Esquire
                       Chief, Appeals Unit
                       Philadelphia District Attorney's Office
                       Three South Penn Square
                       Philadelphia, PA 19107-3499

Type of Service:       (x) First Class Mail        ( ) Certified    ( ) Personal Service

Defendant:             Samuel N. Cabrera
                       Inmate No. LW-0609
                       SCI- Forest
                       286 Woodland Drive
                       P.O. Box 307
                       Marienville, PA 16239-0307

Type of Service:       (x) First Class Mail        ( ) Certified    ( ) Personal Service


Date:  September 30, 2015

_____
Law Clerk's Signature



FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS
JUDICIAL CHAMBERS

SANDY L.V. BYRD
JUDGE

THE JUSTICE JUANITA KIDD STOUT CENTER
FOR CRIMINAL JUSTICE
1301 FILBERT STREET, SUITE 1420
PHILADELPHIA, PA 19107
(215) 683-7157
FAX: (215) 683-7159
WEBSITE:HTTP://COURTS.PHILA.GOV
E-MAIL: SANDYLV.BYRD@COURTS.PHILA.GOV

**FILED**

SEP 3 0 2015

Criminal Appeals Unit
First Judicial District of PA

September 30, 2015

Isla A. Fruchter, Esquire
Assistant Defender, Appeals Division
Defender Association of Philadelphia
1441 Sansom Street
Philadelphia, PA 19102

Re:  *Commonwealth v. Samuel N. Cabrera,* CP-51-CR-0009793-2013
511 EDA 2015

Dear Ms. Fruchter:

Enclosed herein please find a true and correct copy of the Court's Opinion in the above-captioned matter.

Sincerely,

Sandy L. V. Byrd, J.

Enclosure

cc:  Hugh J. Burns, Jr., Esquire, Chief, Appeals Unit, District Attorney's Office
Samuel N. Cabrera, Defendant



FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS
JUDICIAL CHAMBERS

SANDY L.V. BYRD
JUDGE

THE JUSTICE JUANITA KIDD STOUT CENTER
FOR CRIMINAL JUSTICE
1301 FILBERT STREET, SUITE 1420
PHILADELPHIA, PA 19107
(215) 683-7157
FAX: (215) 683-7159
WEBSITE:HTTP://COURTS.PHILA.GOV
E-MAIL: SANDYLV.BYRD@COURTS.PHILA.GOV

September 30, 2015

Lisa Eldrige
Case Flow Manager
Superior Court of Pennsylvania
530 Walnut Street, Suite 315
Philadelphia, PA 19106

RE: *Commonwealth v. Samuel N. Cabrera, CP-51-CR-0009793-2013, 511 EDA 2015*

Dear Ms. Eldrige:

In regards to your notice of June 1, 2015, please be advised that an opinion was filed in the above-captioned case today. A copy of the opinion is enclosed. By this letter, I am requesting that the court administrator expedite return of these records to the Superior Court.

Thank you for your courtesy in this matter.

Sincerely,

Sandy L.V. Byrd, J.

cc:     Natasha Lowe, Esquire, Appeals Unit